First, I'd like to talk about the ineffective assistance of counsel issue, which I think is the issue which will make a difference for Mr. Maka, first and foremost. I recognize that these cases don't come to you on direct appeal very often, and fortunately, I was able to develop sufficient facts which I think will permit you to consider this case on this record at this time on the IAC issue. I was not trial counsel. I was appointed after the verdicts were entered and before sentencing. You'll recall in my statement of facts that trial counsel in this case predicted to the jury that he would be calling Alex Brown, who was a Micronesian who worked on Louie Lenny Maka's pig farm in Nanakuli, which is the place where the six victims were housed in squalid conditions, which Mr. — the trial counsel also conceded in his closing argument. That person, Alex Brown, was not called by trial counsel, despite, as you saw in the excerpts of the record, trial counsel having a specific discussion with the government's counsel, Mr. Shipley, and with the trial court on the record about the logistics of getting Mr. Brown and others who had been subpoenaed pursuant to court order and were available to testify into court to testify the following week of trial. So you have the record that far. Then you need to know, well, so what could Alex Brown have done for Mr. Maka? This was a case where the government had some very hard evidence, which you presented, of his having been physically abusive and psychologically abusive to these six victims, having smuggled them in, harbored them, used documents, either theirs or someone else's, to get them into the United States, fed them sparsely, paid them inadequately or not at all. The evidence required very much, both in the character evidence and something to refute the victims who had their own opportunities for exaggeration and no one to refute. Alex Brown was called by me in connection with sentencing. You have his testimony in the excerpts of record. What did Alex Brown provide you to consider? That Mr. Maka, that he worked for Mr. Maka, that the boys were housed, the boys were the victims. I call them boys at the sentencing, that he never saw Maka mistreat the boys, that Mr. Maka, he saw them work and he never saw Mr. Maka mistreat them at work, that they were happy, that they had a normal attitude. Here's a person who had important evidence about their physical circumstances to refute the victim's testimony. Now, I'm not going to go into that. Also, he had no other evidence. Do we know why, from this record, defense counsel didn't call that witness on the merits? To my mind, there is no explanation. The government hasn't offered one in its brief, and there can't be one. You make the opening statement, you have a witness lined up, the witness goes south on you. Okay. That's a reason not to call it. But you make the opening statement, the government's about to close its case, there's almost a week left in the case, you discuss with the judge how you're going to get the folks off of Fred's farm into the courthouse, and you don't call them, and they testify to what Alex Brown testified to. There's no justification for that, no rationale, because it was a tough case for the defense. And any lawyer worth his salt would have called character evidence, or some, put on some evidence, if it was available, and in this case, it was. We don't know what Alex Brown may have told him, though, do we? I mean, he could have said, I'm not going to testify in this trial. We don't know. I can't tell you that. I understand that. We've all had witnesses like that. I'm sure you have. I have had witnesses who went south on me. But they don't go north again at sentencing. Well, sometimes they do. They don't do that. So I mean, I understand the record's not perfect, Judge Siler, but it's good enough for you to make this decision, because that's not all this trial counsel did. He opened the case by conceding, in effect, alien smuggling and alien harboring. He said to the jury, you'll hear about improper documents used, and you'll hear about squalor on the farm, and you'll hear about Mr. Maka not being a good boss. That was the opening. He'd already set up the jury to consider the alien harboring and smuggling offenses, which he meant no words in in closing. If you read the trial counsel's closing argument, he concedes that Maka beat the boys. He says, referring to a female witness at the trial, that it's inexcusable in this country, that sort of conduct. He admits and tells the jury to convict Mr. Maka of alien smuggling and alien harboring. And the only issue, factual issue, that he doesn't outright concede is whether the victim's wills were overborne. Ladies and gentlemen, that in itself, combined with failure to call a very important character witness which was available and provided appropriate testimony for the jury's consideration, is why I contend that you can read C.I.A.C. issue and should rule in Mr. Maka's favor on that issue alone. If there are no other comments or questions on that issue, I'll move to the multiplicity argument. I don't see anything right here. Okay. It's not an easy one for me, but the way that I read the cases which I've cited to you is that the trafficking statute must include a Chapter 77 offense. If you look at the indictment, the way that Mr. Shipley charged the case, I realize the charging document is not controlling, but he cited the statutory language in every count, and there are six different counts relating to six of the alleged victims, victims 36 and up. Your argument is that the human trafficking counts are multiplicious with the involuntary servitude counts or the alien smuggling counts, right? And don't each of them require an element not present in the other? They're all included within the trafficking statute. That's my argument. They're all included within the trafficking statute. They're included. You can't convict under trafficking and convict under forced labor or involuntary servitude because you've got to prove the same thing. You could have a trafficker, though, that's different from the person who forces them into involuntary servitude. Right? Somebody brings them in, they did that in the early years of this country. But that's not what happened in this case, and that's not the circumstances you're facing on this field either. But bringing them to Hawaii was one violation, right, for purposes of involuntary servitude, and then having them in involuntary servitude is something else, right? Well, here's the way I see it, Judge Seiler. First of all, I'm going to have to cave on the smuggling and harboring arguments that I made because I reflected upon what the statute says. It's a – I think it's a Title VIII statute, and it requires the person to know that a person's not lawfully permitted to enter the United States and to bring them in under false pretenses, basically, using whatever improper documentation. That's – it's really an immigration type of offense. So that – those Title VIII crimes are not subsumed within the trafficking crime. But what I looked at is the slavery – the old-line slavery statute, which is involuntary servitude. I think it's 1584. And in 1584, it doesn't really tell you anything if you read the language, you know, that it's not a voluntary servitude for a term. It's all been developed by case law over the years. And in the case law, in order to establish involuntary servitude, you've got to prove the very things that are specified in the trafficking statute. Well, I think there's one additional one. In – under 1584, you have to prove that they are held. For a term. And in the trafficking statute, 1590, I don't think that's an element there. I'd better look at my indictment language. I've got my chart. Recruit, harbor, transport, provide, and obtain seems to me to cover holding. When you harbor them or obtain them, you hold them. You think harbor is the same as hold? Yes. It's good enough for me. When you harbor someone, what else are you going to do? You've got them. How can you harbor someone and not hold them? And that was the argument that the district court asked for. That happens all the time. If you go into any agricultural area anywhere in Southern California, Arizona, Texas, and you'll find people who are working in the fields, working in agriculture where the employer has provided them a place to live and where there's no force involved at all. They can leave if they want to, but they clearly are being harbored. But under the trafficking statute where you must do these things in violation of Chapter 77, and in this particular case, the allegations of the indictment were that you must do these things in violation of 1584 and 1589, this subsumes those crimes as included offenses. Can one engage in human trafficking without engaging in involuntary servitude? No. If you went on this point, what effect does that have on the sentencing? Not very much, Judge Siler. Which is why I argued it second. I understand that it's a legal question, it's a legal issue, and it may not have any effect on what the district judge does, even if you were to remand for resentencing on this very technical point. You went on the special assessments, I guess, but that's about all. Well, yeah, but that's correct. I mean, but just like Justice Rutledge, a conviction is the prejudice, and you understand the issue. But I'm here mainly because, ladies and gentlemen, trial counsel in this case botched the job beyond negligence. And Swanson is a very good case. He's a very good case to describe the types of misconduct, mis-bad work that a trial lawyer can do, really. And this is a case much like the case that was a bank robbery case in the Swanson matter, where trial counsel conceded everything he needed to concede to lose the case, either in opening or in closing, and he didn't do anything about evidence he had, which I've shown you was available and could have been presented at trial to give this man a defense. I just want to get back to the multiplicities for a moment. The Court decided that forced labor and involuntary servitude were multiplicities, and so would not sentence unhelpful. That's right. Should he have vacated the conviction? Yes, absolutely. That's the standard procedure, and that's a point in my brief. That's why I'm here. Is there a difference between multiplicity for sentencing and multiplicity for findings? I don't believe there is, Your Honor. The case law says there's not. Don't our cases hold that that's the way to cure a problem of multiplicity? To vacate the convictions? Where you have to – where the jury convicts on counts that the trial judge determines to be multiplicious, that the proper remedy is to not sentence on one of the counts. No. The proper remedy is to vacate them and sentence on the counts that are not. What's your best case on that? Regrettably, it's the only case that I cited in my brief. I think it's Castaneda or Chaco, Your Honor. Do you have the citation for that? Castaneda is 9F3rd 761, Ninth Circuit, 1993. Give me that site again. 9F3rd 761. And I – forgive me. The other one is United States v. Universal Court, 344 U.S. 218, a 1952 case. And United States v. Chaco – or rather, United States v. Nash, which is at 115F3rd 1431. There's a case called Lanius. Did you run across that case? Can you spell it for me, Your Honor? Lanius? I don't recall it. It seems to suggest that correcting it by sentencing is enough. However, I found two recent Supreme Court cases after that that seem to think that you need to vacate the conviction. So I'm relying on quite different cases than what you're talking about. I think Rutledge tells us that you need to vacate a conviction because the conviction itself, even if it's not sentence-defined, is prejudicial to the defendant. If there are no other questions, I'll reserve the rest of my time for rebuttal. Okay. That would be fine. We'll hear from the government at this time. Mr. Shipley. Thank you, Mr. Court. Excuse me. Thank you, Mr. Court, counsel. I would like to address the ineffective assistant counsel question first, as Mr. Edwards did. Frankly, I stand here without a lot to say because of the very problem that this Court has cautioned against when raising ineffective assistant counsel claims on direct appeal. There's no record. We have not heard from Mr. Domingo about why he made certain decisions that he made in the process of preparing and presenting his case. The comments that Mr. Edwards attributed to Mr. Domingo in the opening statement naturally followed my opening statement. So the questions of the squalid living conditions and the use of force and that evidentiary, those evidentiary matters, I covered with the jury. The jury had heard about them. So Mr. Domingo, there was some expectation that he would address them to the jury in his opening if he chose to give an opening, which he did. But I think something that the Court must also consider is, given the way that the claim has been raised by Mr. Edwards on direct appeal, we can't consider the issue of whether there was any prejudice. Really, the only case that confronts this question head-on is Cronk, the circumstance under which a complete lack of effective assistance might allow for a reversal of a conviction even in the absence of demonstrable prejudice, even though Cronk doesn't go quite that far, rejecting the circuit court's five-factor test there when it found that the underlying counsel had actually been effective. But we have a circumstance here where the brief submitted by the defense makes no effort to point out whether or not the second prong of Strickland is satisfied on the record by a conviction that is otherwise undermined by the conduct of counsel. And I just – without a factual record being established by Judge Mollway in the District of Hawaii where Mr. Domingo is offered an opportunity to present a factual justification for his tactical decisions, we can't even establish, one, whether his conduct was below the level of competence accepted under Strickland, and secondly, whether his conduct resulted in an outcome that wasn't a foregone conclusion from the strength of the government's evidence in the case. So this case to me strikes me as a classic example of why ineffective assistance claims are generally not effectively litigated at this stage of the proceedings. So it's really all I have to add on that question. There just wasn't a lot I could do, trapped in the record I had, to justify Mr. Domingo's decision-making. On the multiple- Kennedy, do we know anything more about why this missing witness wasn't called? All I can say, Your Honor, is that the memorandum of the witnesses interviewed by Immigration and Customs Enforcement was provided in discovery. The witness was available. I had the witness on my witness list and simply chose not to call him because it was just, you know, in my view, I certainly – in my view, I certainly could have got information helpful to my case, but it would have been cumulative of other information I already had. Why Mr. Domingo chose to not put on any witnesses, I don't know. I anticipated that there would be more of a character-based defense. That's what I was prepared to respond to, was a character-based defense. Whether or not – for all I know, Mr. Maka chose to tell Mr. Domingo, I don't want to bring in friends and family members to defend me on some character basis. It may have been a cultural issue. I don't know. And it's another difficult thing sitting here without knowing Mr. Domingo's justifications. This was an unusual ethnic situation where you had the Tongan community, both in Hawaii and Tonga, quite closely intertwined with who Maka – who Mr. Maka was in the community, both here and in Tonga. And I think from the trial record, the Court could get a little bit of a flavor of that. The idea that Tonga is more of a caste-based society, and Mr. Maka tended to fall in the upper reaches of the society, whereas the people that he was bringing to Hawaii to work for him came from the lower classes in Tongan society. So whether or not Mr. Maka's view of what should be offered in his defense weighed on Mr. Domingo's choices, I don't know. Again, we don't know. Want to move on to the other issues? On the moral publicity issue, I think the case law is clear. It's a two-factor question. First, did Congress intend separate sentences for these separate offenses? And secondly, if so, does cumulative punishment violate the double jeopardy clause? We have really two sets of statutes. If you evaluate this from the standpoint of you have the 13th Amendment statutes that were codified in 1948, and then you have the TVPA statutes that came about in 2000 after the Supreme Court's decision in Kosminski, which led to the passage of the Trafficking Victims Protection Act. As I think Judge Seiler focused on in question of Mr. Edwards, the way these statutes work is the human trafficking statute really applies to the acquisition of a labor force, an unlawful labor force. Whereas the involuntary servitude, forced labor, document, P&H statutes, those apply to the maintenance of that labor force. And so there's two angles that the government takes in approaching these prosecutions. And as is clear from my brief, and it's clear from the statutes, it doesn't have to be the same person involved. The person that violates the human trafficking statute can have nothing to do with the underlying forced labor statute. They may just be in the business of finding laborers, transporting them to the location, and turning them over to the person who wants to utilize unlawfully their labor. But I just – in simply looking at the breakdown of the statutory elements under Blockburter, you can clearly see that the elements – and that's what the Court must focus on, as I'm sure the Court is aware, not so much the proof at trial, but the elements of the offenses. Human trafficking under Section 1590 is knowingly recruits, harbors, transports, provides, or obtains by any means any person for labor or services in violation of Chapter 77. So while the ultimate goal has to be a violation of Chapter 77 with that labor force, that's not the focus of the statute. The focus of the statute is recruiting, harboring, transporting, providing, or obtaining that labor force. The involuntary service statute applies to holding to involuntary servitude any person for a term. Involuntary servitude being defined in Kosminski as being the use or threatened use of force or legal coercion, as distinguished from the forced labor statute passed in the Human Trafficking Protection Act, which brought into the scope of the prohibition's psychological coercion or coercion aimed at a third party. The document – and I'm going to leave out the forced labor simply because Judge Mulway found that the forced labor statute, as proven in this case, was multiplicitous to the involuntary servitude convictions because there was force use, physical force and violence use, which in her mind basically satisfied both statutes with the same conduct. Your opponent argues that one of those should have been vacated. What's your position on that? I don't think so. And I must concede that I did not brief that particular point in my brief. I have briefed it in other cases involving guns and firearms, where you have a possession of ammunition and a possession of a gun and you prove both. And my recollection of that case law is the remedy is to only sentence on one. I must also concede I didn't look at the judgment and conviction before coming to court, but my recollection is that Judge Mulway did vacate the conviction on counts 7 through whichever the forced labor statutes were. I just recall from looking at the judgment and conviction that she did vacate those counts in addition to not sentencing. I could be mistaken, but the record, I'm certain, is clear one way or the other. So to the extent that a remedy is to which counts would those have been, 7? The forced labor, the human trafficking was 1 through 6. Involuntary servitude was 7 through 11 or 12. I don't have the exact number. It would have been 13 through 16 or 13 through 17, because I believe they followed the involuntary servitude counts. We have one count for every victim moving from statute to statute. So as far as even if the Court, as Judge Siler pointed out, came to a conclusion here that there was multiplicity in the manner in which these counts were charged, the only remedy for this particular case because of the manner in which Judge Mulway ultimately sentenced the defendant, and I think Mr. Edwards has conceded that he doesn't believe now there's multiplicity between the Title VIII convictions and the Title XVIII convictions, because she only ran those sentences consecutive. She ran all the Title VIII sentences concurrent and all the Title VIII sentences concurrent but consecutive to Title XVIII because the only consecutive nature of the Title XVIII and Title VIII, the only remedy really is the $3,400 special assessment for any counts that would be found to be multiplicitous. But I don't believe I have any other comments for the Court unless there are any further questions at this point. I don't see any. Thank you for your argument, counsel. We'll hear rebuttal at this time. Just to answer your question, Judge Hawkins, the and the question that I'm going to answer is the description by Mr. Shipley, at excess of Record 171 is the page of the judgment which shows the convictions on all 34 counts. There are asterisks by counts 18 through 23, and there's a note which says the Court declines to sentence the defendant on those counts. So those convictions remain. My argument is not just regarding the forced labor counts. My argument is regarding the Chapter 77 offenses being multiplicity and properly left in the record. Those convictions need to be vacated. As far as the argument about prejudice, yes, my main argument on IAC is that you should presume prejudice because of what I've argued in my earlier argument under Cronic. But I did argue at page 19 and following the actual prejudice which is shown by this record. Don't you think you could develop a better record on habeas? Well, I don't think so, Judge, and it may not be appropriate for me to tell you why. And if so, Mr. Shipley will object. But I've asked the lawyer why he didn't call the witness. This is not part of the record. So there you go. So the answer is I don't think so. Well, I think I'm stuck with what I've got. At least Mr. Domingos, Domingo, would have an opportunity to get his side of the story. He would, but that's not his call. I mean, that's not this is not about Mr. Domingo. My client's in jail for a long, long time. This is about whether or not he got him. That's very much about him. We don't know his reasons. Well, I understand your position, Judge Holmes. Okay. All right. Thank you both for coming in today. The case just argued will be submitted for decision. The court's going to stand in recess for about five minutes of counsel on the last case. We'll come forward and get assembled at the counsel table, and we'll be ready to go in about five minutes.
judges: B. Fletcher, Siler , Hawkins